S.A.R.L. Galerie Enrico Navarro versus Marlboro Gallery. Good morning, Your Honors. Jeremy Wollison from Wollison & Wollison, representing the appellants. The paradigm towards this interference case involves a competitor. Can I go off? Absolutely. I'm trying to understand the relationship amongst the three key characters here from our standpoint. One is Mr. Katsoukis. Is that his? Katsoukis, Your Honor. I never get that right. Mr. Katsoukis. It took me about two years into the case. Thank you. I have more than a year and a half to go. He, I've seen an affidavit to the effect that he was not an employee of Marlboro, but was part of something called Mint, which was a consultant to Marlboro. Is that accurate? On one level, it's accurate, Your Honor. He was hired as a consultant, but for all purposes, and this hasn't been part of the summary judgment motion, but for all purposes he was the functional equivalent of an employee. Marlboro paid his health insurance. Marlboro paid for his cell phone. That's why we have the phone records. And Mint, for what it's worth, it seems is a single-member entity where Katsoukis is the sole member. Let's go back to Mr. Levi. I don't know if I pronounced that correctly. How do you walk back the, I mean, is it Mr. Katsoukis? Katsoukis. Mr. Katsoukis' behavior that is being attributed to Mr. Levi, or is it Mr. Levi's behavior that we're looking at here? I think with respect to Mr. Levi, there is direct participation, right? Again, you have to go through. Yeah, go ahead. Yeah, I'll tell you. As we understand it, November 28, 2006, Gilbert Lloyd, who is Mr. Levi's co-director of Marlboro, sends Mr. Levi an e-mail attaching, among other things, three lots from Christie's auction that's coming up for the plates, Mr. Navarro's Apparently, again, because later that same day, the next thing we see is e-mail traffic between Mr. Levi and Mr. Katsoukis. Levi apparently reaches out to Mr. Katsoukis. Katsoukis responds. So these three more ceramics are coming up at a different auction. And then the next time the written record picks up is the report in February, toward the end of February, from Mr. Katsoukis to Mr. Levi saying, here's the report. I went and I talked to Mr. Chu many times about the Navarro project. One thing leading to another. I get the copy of his contract, and I read it, and lo and behold, I find a flaw. And we can get into the word flaw and exactly what that means. I find a flaw, and by the way, I've now referred him to a lawyer, and that lawyer is telling me that he can get back all or half of Chu's rights in the ceramics. I would say that evidence, along with the other circumstantial evidence in this case, allows a jury to infer that Mr. Katsoukis was sent at the direction of Mr. Levi to interfere in my client's contract, which is not simply Mr. Levi having some sort of respondeat superior liability. That's fine. Mr. Katouzi, I say this really only to see if I get it right. I take it he's no longer part of this case. He is only a defendant now. Yes, he's correct. He's not an appellee. So just to continue with where I was going, this is a classic tortious interference case, right? In the tortious interference case, a competitor talks to a third party, encourages that third party for his own, its own benefit to break a contract with the competitor's rivals. Those are the facts of Martha Stewart case we cited. They're the facts of the Maya Angelou case we cited. They're the facts of the Gardlife case we cited. And they're the exact facts here. My client, beginning in 2003, had a contract with Mr. Chu to make these ceramic plates. And in that content, I should also point out at the time when that contract was made, Mr. Chu was a somewhat obscure artist. Now, of course, his paintings sell for $10 million and up each. But at the time, he was an obscure artist. So everything goes very well with that contract for three years, right up until the point when Mr. LaVey learns of the plates and Navarra's interest, sends Cattuzzi to have many discussions with Mr. Chu about his competitor's contract. That's what I said, Your Honor. Again, it's an inference from the evidence. It sends Cattuzzi to have many discussions with Mr. Chu about the competitor's contract, and immediately after these discussions, what happens? Having shown the plates himself at a museum in Brussels, having participated in setting prices for the plates at a gallery in Paris, having posed with the plates for use by Mr. Navarra in a selling catalog, now, all of a sudden and immediately following those discussions, Mr. Chu wants to cut Navarra out of the contract so he can sell the plates to another client who he believes would buy the whole thing. A cease and desist letter is sent demanding that all the plates be returned and production of additional plates cease. And then eventually, the worst thing of all that can happen in the art world happens, which is a public statement from the artist himself saying that the works that my client paid for, invested in, was getting ready to promote, were fakes. Meaning, I'm sure all of you are familiar with the recent Leonardo da Vinci that was sold for $450. Are you familiar with the recent use of the word fake? Yes, exactly, Your Honor. This is perhaps a more damaging use of the word fake than the one I believe you're referring to. But in the Leonardo da Vinci context, that painting, Salvatore Mundi, sold for $450 million in the past year. It was bought before it was attributed to Leonardo da Vinci, or before it was broadly attributed to Leonardo da Vinci, for $10,000. The importance to the value of a work of art, of an attribution, of being able to say, this is an original. Is there circumstantial evidence of Mr. LaVey, did you say, being involved in that particular phase of this? Well, I would say in that particular phase, I think eventually there will be some circumstantial evidence. If you look at the phone records, for example, which we use to show Cattuzzi's involvement, I didn't highlight this, but there's a number in there right in the middle of all the calls back and forth between Mr. Cattuzzi's, Mr. Bourdon, Chu's lawyer, and Chu's son. There are calls back to the Marlborough office in New York. Now, again, in the context of the whole thing, will that be sufficient circumstantial evidence? I'm not entirely going to die on that particular hill. What I will say, however, is that doesn't matter. And the reason it doesn't matter is the but-for causation concept that my adversaries dismiss as a red herring, but in fact is the key. And this goes back to that 24-7 records decision from this very court, which is you don't have to be, you don't have to know specifically how the contract counterpart or the contract party is going to breach. All you have to do is be there at the beginning and be the one who flipped the contract counterparty from being, obeying his or her or its contractual obligations to wanting to turn against them. Those are the exact facts. What you're saying is that it is analogous, perhaps perfectly, perhaps closely, to a sufficiency of the evidence kind of argument in a criminal conspiracy case. You're saying that Levi had the motive, certainly reason to find that. He had the means, Cattuzi. He had the opportunity, for sure, and there was, it is possible on the evidence to infer the existence of an agreement to interfere with your client's contract. And once that happens, whatever one of the co-conspirators does in furtherance of the general objective to which all of the conspirators are parties is the responsibility of each and every one of them as a matter of law, right? Your Honor, that's exactly right. And I would just say, you know, it's all roads lead to Rome kind of argument. It works under that way of looking at it, but it also works under the 24-7 records point and the guard life point, which is simply the concept of but-for causation. As Your Honor was on a panel in a, unfortunately, it was an unsighted case or an unpublished case, the Michel-Pommier-Models case, which involved tortious interference, and you observed exactly this very point, which is the standard for this particular element of tortious interference that we're dealing with is simply can a jury conclude that but-for, but-for the interference, whatever it was, of the defendant, the contract party would have continued performing its obligations. That's the essential standard. We don't — Mr. Leve, Mr. Cattuzis didn't even have to contemplate that Chu or in Chu's name it would eventually be denied that he had authorized these plates. They didn't need to know that at all under the but-for rule. Nevertheless, as we point out extensively in our brief, they did. And in fact, they're on the phone at the critical time. They set in motion a course of events, in your view, the object of which was to get the business away from Navarro and get it for themselves. And whatever served that end, they're responsible for. That's precisely right, Your Honor. I know you want to reserve some time, so let's hear from your adversary, okay? Thank you. Thank you, Your Honor. Good morning. May it please the Court. Richard Rossberger on behalf of the defendant's Marlboro Gallery and its president, Pierre Leve. Plaintiff's counsel acts like this is a classic tortious interference case, but it's anything but. The district court properly granted summary judgment on intent, an element that plaintiff's counsel wishes to avoid. Plaintiffs failed to provide any significant probative evidence that defendants intentionally intended to induce Mr. Chu to engage in any of the alleged bad faith acts. From a very large record, all that plaintiffs have are suspicions, distorted testimony, and record sites that don't stand for the underlying proposition. Moreover --" Intent is a subject matter of inference, so now the question is whether the evidence that was introduced could admit the inference of intent. And if I understood counsel correctly, he's pointing among other things to evidence of the sequence of phone calls. And I think also to the timing with respect to the letter that's found in your client's files. I understand. Why don't you tell us why viewed most favorably to the plaintiff, as it must be on summary judgment, that can't admit an inference that they knew about the scheme and intended the scheme to breach and intended for it to go forward? Well, Your Honor, there's a very voluminous record of the cases that Mr. Wallace incites, Macy's and the Hallmark-Maya Angelou case. There was evidence that the alleged tort fees or e-mails, things like that, strategize What I'm trying to ask you about, for instance, this letter in your client's files, and you all argue that, well, who knows when it was put there, but it departs from the letter that was sent, which would suggest an inference that it is an earlier draft. And if your clients are in possession of an earlier draft, wouldn't that admit an inference that they were in on the plan to breach the contract? I understand that. What I'm saying, Your Honor, is there's no meat to that. That's simply window dressing. I have really no explanation as to why, nor my client, why it's there. It could have been collected in the course of gathering information for this litigation. We don't deny that Yvonne Chu and If you want a favorable inference, you would have had to have adduced evidence. Otherwise, I mean, I know I pulled it out, but it's put together with the fact that persons associated with your client get in the lawyer. Then they're talking to each other. They're talking to each other at times and dates that counsels just argued raise an adverse inference. And they've got a draft of the letter, which suggests their involvement. But their friends, unlike the other case where telephone records do show some relevance, because there was no other reason for the telephone callers to talk to each other, Mr. Bordone was Cattuzis's lawyer. They had many, many matters involved. Cattuzis and Yvonne were not only friends, they were doing things for Marlboro's Gallery. There was every reason for them to talk, and making the inference that it had anything to do with the plates is pure speculation. But also, Your Honor, even if there was a cease and desist draft that was found in Marlboro's files, it only pertains to the cease and desist letter. You have to have intent to induce a breach, to induce each alleged breach. This Court said that in 24-7 Records v. Sony. The First Department said that in Macy's, Inc. v. Martha Stewart, where they found that there was sufficient evidence that the defendants sought to induce both alleged breaches, the breach of a nondisclosure and a breach of an exclusivity clause. I do want to turn, Your Honors, because I think a very strong argument, and we can get beyond the weeds of what Mr. Wallison thinks is evidence we think is just speculation, is the issue of statute of limitations. Plaintiff's cause of action for tortious interference accrued no later than July 2007, when the French lawsuit was brought. Has the district court addressed the specific argument you're making now? No, it's not. It was briefed before the district court, and clearly this court can determine this. It's a matter of law that this court can make a determination on the statute of limitations. Plaintiffs argue that the French lawsuit wasn't a breach. To avoid the statute of limitations, they allege that the French lawsuit wasn't a breach and didn't cause them harm. But this directly contradicts their pleadings. Exhibit A, Plaintiff's admitted complaint, which states, Defendants intentionally interfered with the production agreement and plaintiff's rights and expectations thereunder by, quote, acting to void the production agreement through a frivolous lawsuit ostensibly brought on behalf of CTC. It continues. By these actions, defendants have caused a breach of the production agreement and caused plaintiffs substantial damage. Second, to avoid the time bar, plaintiffs contend that the cease and desist letter and French lawsuit on the one hand were independent from the later Christie's ad and a JD ad, which plaintiffs now strategically contend are the only two breaches. This also flies in the face of all the evidence. Plaintiffs have stressed throughout that all of the alleged bad faith acts, the French lawsuit, the cease and desist letter, the JDA ad, the Christie's email, were all part of one single campaign, paragraph 33 of the original complaint. Margo embarked on a systematic campaign in essence to erase the plaintiff's existence. Paragraph 42 and 49 of the original complaint, calling the Christie's email and JDA ad steps in the campaign. Paragraph 54 of the amended complaint, describing the bad faith acts as taken in the course of one campaign. Do I understand you correctly that if, that it's your position, that if there was a campaign to induce breach, the cause of action accrues at the first moment when something occurs that gives rise to damage that is actionable and that if that's prior to the limitations period, then everything that comes after that, even as late as three days before the filing of the complaint, is barred? Absolutely. Your Honor actually made that point in Chevron v. Donziger. Okay. Where you ---- I hope you read all 500 pages. No. I read the important one for this case. In that case, you expressed that tortuous interference with contract is not a continuing tort, meaning the statute of limitations accrues upon injury from the first breach, regardless of the fact that the contract may be continuing and that there are subsequent breaches. For example, in Andrew Goldberg v. Swain, a case we cited, the Third Department did not dismiss a claim for misappropriation of trade secrets because misappropriation can be a continuing tort. But it did dismiss the tortuous interference with contract claim because tortuous interference is not a continuing tort. TRG v. Nemchoff, another case we cite, the Court held that tortuous interference is not a continuing tort, like nuisance or continuing trespass, and found the T.I. the tortuous interference claim began on first breach. Thus, when plaintiffs try to craft their own law saying this trespass versus conversion analysis should be somehow imposed on the statute of limitations for tortious interference claims, they run into an unyielding obstacle, which is no New York court has adopted that position. Plaintiffs cite highlight products v. American Home Products. They heavily rely on this. It's a Seventh Circuit case applying Illinois from 1993, but that doesn't represent New York law. One other point. Sotomayor Why should we reach out to decide this when the district court didn't deal with it at all? And if the answer is because we have the power, yes, I understand that. But why should we do it? I think it's a matter that can be easily addressed without any facts. It can be addressed simply from the admissions and concessions here and the New York law that I cited, including Your Honor's case. It's not a — it's just an efficiency issue. It shouldn't go down for a remand to the district court on this issue when this court can solve it as a matter of law and address it. Let me ask, while we're talking about efficiency, once the federal claims went out of this case, why did this stay in the district court? I think the court took it on supplemental jurisdiction. It didn't say so, though, right? It did not say so, but that's what I assume. There were a number of cases, by the way, that got barred by the statute of limitations, including all the federal causes of action. I just want to mention one more thing, Your Honors. It's not a classic case because plaintiffs can't show a breach. They've alleged that the CHU didn't engage — But there's no breach. There's no statute of limitations. Isn't that true? They've — they allege that there is a — I guess they could lose on either — on either way, Your Honors. They have to have a breach, and they lost on statute of limitations. They can pick their poison. But they've alleged that CHU engaged in no-breaching contract — conduct. Plaintiffs now allege that Mr. CHU acted through Bordone and Mr. CHU's son, Yvonne, and that their conduct can be imputed to Mr. CHU. The fatal defect with this is that those supposed agents must be under CHU's control, and here plaintiffs have contended the exact opposite. And let me just read two paragraphs or three paragraphs. Amended complaint, paragraph 50. Over the course of the actions and events described herein, Yvonne ultimately explicitly assumed the role of a Marlboro agent. A Marlboro agent. Paragraph 58. Bordone was taking directions not from CHU, but from Ctuzis, the Marlboro consultant. And in plaintiff's motion in support of the amended complaint, they state, Bordone and Yvonne were acting for financial gain as agents and under the direction and control of Marlboro. We know that nonparties to a contract can't breach a contract. Here there's no allegation or no evidence that Bordone and Yvonne were agents of Mr. CHU acting in the scope of their agencies. And plaintiffs can't fall back on apparent authority because there's no evidence that CHU communicated to any third party that Bordone or CHU had the authority to stop a sale at Christie's. This is the second alternative round. Correct. The district court only dismissed on the basis of intent, because everything, all the evidence was simply speculation upon speculation, assumption upon assumption. Sotomayor is now urging us to find a flaw in the record that the district court did not rely on. The district court didn't consider and didn't rely on. Right. Thank you. Mr. Wallison, you have a few minutes in rebuttal. Thank you, Your Honor. On the statute of limitations question, I don't want to belabor the point. All I will say is that it's a misreading of the complaint, the way that Mr. Rossberger described it. And, you know, the only way this sort of misreading of the complaint can have any probative value in this case is if it were somehow a judicial admission. But it's not a judicial admission, and nobody knows better than Mr. Rossberger that it's not a judicial admission. Mr. Rossberger, at Mr. Navarro's deposition, asked him point-blank, did the French lawsuit breach the production agreement? Mr. Navarro responded point-blank, no. And then Mr. Rossberger moved on to the next question. This was also — well, I'll leave that to the side. Now, in terms of the Chevron case, in our reply brief, we mentioned Spinapp and Monax. So on the Chevron case, that, too, was a material breach. I mean, the law is not very complicated here. In all the cases where New York courts talk about a — whether tortious interference is a continuing tort, those are all cases where the first breach absolutely destroys any value or expectations in the contract. In the Chevron case in particular, that was a release that Ecuador gave to Texaco. Ecuador then passed a law that gave individuals private rights of action to sue Texaco. That was a breach that completely destroyed any further expectations. Texaco could have had that. It would be protected from liability, the very thing that they bargained for. And all the other cases are the same. Let me briefly clear up one thing. Mr. Bourdon testified at his deposition that he was not at the critical period Mr. Cattuzzi's lawyer at various points. At other times he may have been, but he was clear as a bill that he was not Mr. Cattuzzi's lawyer during the period where the phone records cover. Now, on the final point, intent, which Mr. Rossberger says we don't mention. Let me give you intent. The intent when Mr. Cattuzzi started these discussions with Mr. Chu. They were started by Marlborough, those discussions. They were started at a time when Marlborough had in effect conditioned its willingness to represent Mr. Chu on being Mr. Chu's main dealer. They were started exactly at the time when Marlborough was using its influence over Mr. Chu to get another dealer out of what Mr. Cattuzzi's in his private e-mails to Mr. LeVay referred to, quote, unquote, as the race. And in those discussions we know from just that one e-mail, in those discussions we know that Mr. Cattuzzi's, like Hallmark in the Maya Angelou case and like J.C. Penney in the Martha Stewart case, was scouring Mr. Chu's contract with Mr. Navarro looking for, quote, unquote, flaws, which he then successfully found. And finally, if you needed any more circumstantial evidence that they intended to do exactly what they did, Mr. Cattuzzi's, when asked about this at his deposition, testified in the most check – I'll be very charitable and say it was he testified evasively. Let me give you one example, which is just simply the point where he testified evasively. I asked him, and were you aware, again, before getting the phone call on this message left on the machine, were you aware of the kinds of projects he was involved in? Mr. Cattuzzi's, no, no, I didn't follow his career. No, no, referring to Mr. Navarro. So were you aware that he had a contract with Mr. Chu? Answer, he had a contract with Mr. Chu? I don't know. Now, that is the person who wrote the e-mail saying he had talked to Mr. Chu many times about this very contract and had read the contract, had found a flaw in it, then subsequently sat in on attorney-client meetings between the Chu family and their lawyer about this very contract. You get the point. Thank you, Your Honor. Thank you very much to both sides. We're going to take the matter under advisement. The final case on our calendar, Zaretsky v. Zaretsky, is on submission, so we stand adjourned. Four minutes, Your Honor. Four minutes, Your Honor.